UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: BRIAN R. WEISCHEDEL, | : | Chapter 7 |
| Debtor | : | Bankruptcy No. 12-20752REF |
| JANE DOYLE, | : | Adversary No. 13-0042 |
| Plaintiff | : | |
| v. | : | |
| BRIAN R. WEISCHEDEL, | : | |
| Defendant | : | |

# MEMORANDUM  OPINION ENTERING JUDGMENT IN FAVOR OF DEFENDANT

## I.    INTRODUCTION

This case is straightforward -- many of the controlling facts are not in dispute.  Plaintiff, Jane Doyle, and Debtor/Defendant, Brian R. Weischedel, were involved in an ill-fated romantic relationship, during which Plaintiff authorized Debtor to use one of her credit cards.  Upon the demise of the relationship, Plaintiff discovered a significant outstanding balance on the credit card account and demanded that Debtor pay the balance.  The former couple executed a settlement agreement to resolve their dispute.  Later, Debtor was unable to pay the amount due under the agreement and filed his Chapter 7 petition, initiating this bankruptcy.

1

Plaintiff filed her complaint seeking to deny Debtor's discharge pursuant to Section 727(a) of the Bankruptcy Code, 11 U.S.C. §727(a)(2), (4) and (5). Alternatively, Plaintiff sought to render the debt owed to her by Debtor nondischargeable pursuant to Section 523(a)(2)(A) & (B) and (a)(6), 11 U.S.C. §523(a)(2)(A) & (B) and (a)(6). Further alternatively, Plaintiff seeks to determine that the debt owed to her by Debtor constitutes post-petition debt and is therefore not subject to discharge. Upon my findings of fact, conclusions of law, and discussion below: (1) The debt is pre-petition debt; (2) Plaintiff failed to prove that any part of the debt should be nondischargeable under either Section 523(a)(2)(A) or (B), or Section 523(a)(6); and (3) Plaintiff waived her argument or, in the alternative, failed prove that Debtor should be denied a discharge under Section 727(a)(2), (4) or (5).

As will be obvious below, Plaintiff's failure to prove the same factual issues underlies my denial of many of the charges raised by Plaintiff. My examination of the facts and my discussion to how the law applies to those facts (or Plaintiff's failure to prove them) in one sub-section below apply to many other sub-sections as well.

# II.  BACKGROUND

Plaintiff and Debtor were in their relationship from approximately August 2009 until November 2010.  After the first few months of dating, Debtor moved into Plaintiff's home.  Debtor contributed money and worked on Plaintiff's home more or less in return for living there.

Plaintiff was diagnosed with multiple sclerosis nearly twenty years ago. As a result, she can only work part-time and has a limited income.  She has received social security disability since 1996.  Because of Plaintiff's disability, Debtor and Plaintiff's son assisted Plaintiff by, inter alia, retrieving her mail on a daily basis.

In late 2009, Debtor was hired in a new job that required travel.  Debtor was obliged to pay for his travel expenses and then submit those expenses to his employer for reimbursement.  As a result, Debtor needed a credit card.  Because Debtor had previous financial difficulties and a poor credit history, however, Debtor neither had, nor could he obtain, a credit card.

Debtor told Plaintiff about his new job and the travel requirement.  He told her that he did not have a credit card and could not obtain one because of his financial difficulties and poor credit history.  Sometime around December of 2009, Plaintiff voluntarily added Debtor as an authorized user on her Visa credit card. The oral understanding and agreement between the parties was that Debtor would

3

use the credit card "primarily" for business expenses. Debtor also agreed that he would be responsible for making payments on the card, including paying off an approximate $1,400 balance that Plaintiff had previously accrued on the card before she had added Debtor as an authorized user.[1]

After receiving the Visa card from Plaintiff, Debtor used it to pay for business related travel expenses and to purchase various items and services for both himself and Plaintiff. Debtor's non-business purchases for Plaintiff included gifts and flowers and materials needed to repair her home.[2] Debtor intended to pay for his charges by using the business expense reimbursement he received from his employer and otherwise by making the minimum monthly payments. Throughout the parties' relationship, the couple never spoke in specific terms about finances and they never discussed the balance owed on the Visa card.

On or about November 30, 2010, the couple's relationship ended and Debtor moved out of Plaintiff's home. Although his relationship with Plaintiff had ended, Debtor continued to make at least the minimum monthly payments on the Visa card. Sometime in December 2010, Debtor changed the mailing address for the Visa card to his new home. Debtor testified that he was required to change the

---

[1] Plaintiff had paid only the minimum required monthly payment on the card for the months of November and December of 2009.

[2] Debtor also used the card for some indirect business purposes, including payment to an attorney to represent him in a matter involving his driver's license and a fine. Debtor's driver's license suspension litigation constitutes employment-related expenses (despite the apparent absence of reimbursement for them) because he needed his license for his job.

4

address to get the monthly statements and continue to make payments on the

account over the internet because the address linked to the card needed to match

the address linked to the debit card through which he was making payments.

Debtor made continuous payments on the account from January 2010 (the first

month a payment became due after he was made an authorized user) until October

2012, shortly before he filed his Chapter 7 petition.[3]

At some time in late 2010 or early 2011, Plaintiff applied for a loan with

PSECU. In January 2011, Plaintiff was advised by PSECU that her loan

application had been denied and Plaintiff investigated the denial. On February 28,

2011, Plaintiff called FIA Card Services, the issuer of the Visa card that Plaintiff

had given to Debtor to use. Plaintiff learned for the first time that the card was

over its limit and that the address linked to the account had been changed. Because

Plaintiff had not received any statements after Debtor changed the address for the

Visa statements, she had assumed that the account had been fully paid and had a

zero balance. Plaintiff immediately called Debtor but was unable to reach him.

Plaintiff testified that, when she eventually spoke to Debtor on March 2,

2011, he was unable to explain why the balance on the card was above its credit

limit, stating only, "Because it is." Oral recording of trial, May 8, 2013, 10:02 a.m.

---

[3] Some dispute exists on when he made the last payment. Plaintiff says it was October 2012 and
Debtor says it was September 2012. For the purpose of this decision, the difference is not material.

Debtor, however, testified that he did not remember making such a statement. Oral

recording, May 7, 2013, 2:44 p.m.

By February 3, 2011, the balance due on the credit card had been

$14,698.54.[4] On April 22, 2011, Plaintiff filed an Identity Theft Victim's

Complaint and police report against Debtor with the Pocono Township Police

Department. The police later closed the identity theft case, having taken no further

action. Plaintiff also initiated a private criminal complaint against Debtor with the

local Magisterial District Judge on November 18, 2011. Once again, the

authorities took no action against Debtor. Plaintiff received a letter from the

Magisterial District Judge suggesting that she could pursue the matter civilly.

On April 5, 2011, Plaintiff filed a complaint against FIA Card Services

with the Pennsylvania Attorney General's Bureau of Consumer Protection ("the

Bureau"). FIA responded by advising the Bureau and Plaintiff of the obvious: By

naming Debtor as an authorized user of the credit card, Plaintiff authorized Debtor

to use the account with the same charging and other privileges that she enjoyed as

the primary cardholder. FIA further stated that Plaintiff's account did not permit

her to limit the nature or amount of authority she gave to an authorized user. On

August 2, 2011, the Bureau sent Plaintiff a letter advising her that it would not do

---

[4] This appears to be the highest balance accrued on the card. Debtor continued to make
payments, however, and the balance on the VISA, as of September 5, 2012, was reduced to $11,840.85.

6

anything to resolve the matter and that she could pursue the matter on her own or through an attorney.

On September 24, 2012, Plaintiff filed a six-count complaint against Debtor in the Monroe County Court of Common Pleas alleging fraudulent use and concealment of the credit card. The complaint sought damages against Debtor for the balance owed on the credit card (which, at the time of the filing of the state court complaint, was approximately $11,840.85), for interference with credit/slander of credit, and for negligent and willful infliction of severe emotional and physical distress.[5]

Debtor testified that after the state court action was filed, he received telephone calls from counsel for Plaintiff, who threatened him with criminal and civil[6] charges, arrest, and imprisonment. The threats confused and upset Debtor and led him to try to settle the dispute. The parties then entered into a settlement agreement, dated as of October 4, 2012. Prior to signing the settlement agreement, Debtor had spoken to his mother, who had agreed to provide him with sufficient funds to pay the amount due under the agreement. Debtor also thought he had access to a whole life insurance policy that would provide him with funds to make the payment. At the time he signed the settlement agreement, therefore, Debtor

---

[5] The state court complaint also included two counts in mandamus, which sought declaratory relief in the nature of an order directing Debtor to assume or otherwise satisfy the debt Plaintiff owed to FIA Card Services on the Visa credit card.

[6] Although Debtor referred to Plaintiff's counsel's threats with some confusion, his description of the lawyer's threats seemed to be of criminal sanctions.

intended, and expected to be able, to make the payments due under the agreement. Ultimately, however, he had no recourse to any whole life insurance policy and his sister, who handles their mother's finances, told her mother not to provide funds to Debtor to make the lump-sum payment due under the settlement agreement.  As a result, Debtor was unable to pay the amount that would have become due under the settlement agreement on November 30, 2012.  He filed his Chapter 7 petition on November 17, 2012.

On January 28, 2013, Plaintiff filed her complaint initiating this adversary proceeding, praying that I find the debt owed to her by Debtor nondischargeable for the reasons described above and below in this Memorandum Opinion.  Debtor filed his answer to the complaint on February 27, 2012.  I conducted the trial in this dispute on May 7 and 8, 2013, after which I directed the parties to file briefs.  The briefs have now been filed and the matter is ripe for disposition.  This Memorandum Opinion sets forth my findings of fact and conclusions of law controlling this decision.

# III.  DISCUSSION

## A.  Complaint Count II – The Debt Owed by Debtor to Plaintiff Is Pre-Petition and Subject to Discharge

Plaintiff maintains in Count II of her complaint that the debt owed to her by Debtor is a post-petition debt and is therefore not subject to discharge under Section 727(b).  Plaintiff's argument is based on her belief that the debt did not arise until after Debtor breached the settlement agreement by failing to pay the lump sum that became due on November 30, 2012, which was after Debtor filed this bankruptcy petition.  Plaintiff's analysis is incorrect.

The Bankruptcy Code defines the term "debt" as "liability on a claim." Section 101(12) of the Bankruptcy Code.  11 U.S.C. §101(12).   "Claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Section 101(5)(A).  11 U.S.C. §101(5)(A).

Plaintiff had a right to payment from Debtor as soon as the settlement agreement was executed.  It makes no difference under the Bankruptcy Code that her right to payment was unmatured.[7]  See CDI Trust v. U.S. Electronics, Inc. (In

---

[7] The term "mature" is defined in Black's Law Dictionary as "to become due."  Black's Law Dictionary (9th Ed. 2009).

9

re Commc'n Dynamics, Inc.), 382 B.R. 219, 232 (Bankr. D. Del. 2008)("Many courts have held that a claim (albeit contingent) which is based on a written agreement arises at the time the agreement is executed even though the breach of the agreement does not occur until later."). I therefore find and conclude that the debt owed by Debtor to Plaintiff is a pre-petition debt subject to discharge under Section 727(b). I will enter judgment in favor of Debtor on Count II of the complaint.

## B.   Complaint Count III - Plaintiff Failed To Prove and Waived Her Argument that Debtor Should Be Denied a Discharge Under Section 727(a)(2), (4) or (5)

Count III of Plaintiff's complaint alleges that Debtor should be denied a discharge under Section 727(a)(2), (4) and (5) because he allegedly gave incomplete and inconsistent answers during the Section 341 meeting of creditors regarding the existence and disposition of a life insurance policy which Plaintiff alleges was an asset of the bankruptcy estate.

Counsel for Plaintiff questioned Debtor during the trial concerning the life insurance policy. The testimony elicited did not establish that Debtor had given incomplete or inconsistent answers during the Section 341 meeting regarding the existence or disposition of a life insurance policy or any other asset.

Furthermore, Plaintiff did not establish that Debtor failed to explain any loss or diminution of value of the life insurance policy or any other asset or that he had transferred, removed, destroyed, mutilated or concealed the life insurance policy or any other asset. I therefore find and conclude that Plaintiff failed to prove that Debtor should be denied a discharge under Section 727(a)(2), (4) or (5). In addition, Plaintiff failed to raise or discuss her argument that Debtor should be denied a discharge pursuant to Section 727(a)(2), (4) or (5) in any of her post-trial submissions. I therefore also find and conclude that Plaintiff waived this argument. For both of these reasons, I will enter judgment in favor of Debtor on Count III of the complaint.

## C.  Complaint Count I - Debt Is Dischargeable Under Section 523(a)(2)(B) Because Debtor Did Not Use a Written Statement Respecting His Financial Condition with Intent To Deceive

Plaintiff requests, in a portion of Count I of her complaint, that the debt owed to her by Debtor should be found nondischargeable under Section 523(a)(2)(B), which provides that a Section 727 discharge does not discharge a debt for:

> [M]oney, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> . . .
>
> (B) use of a statement in writing—

11

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such
money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to
deceive .... "

11 U.S.C. §523(a)(2)(B).  Objections to the dischargeability of a debt under

Section 523(a) contravene a fundamental goal of the Bankruptcy Code, which is to

provide debtors with a fresh start.  Objections to discharge must therefore be

strictly construed against a creditor and in favor of a debtor.  Nakonetschny v.

Rezykowski (In re Rezykowski) 493 B.R 713, 721 (Bankr. E.D. Pa. 2013).

Debtor represented in the settlement agreement that he would have funds

available to him on the lump-sum payment date of November 30, 2012.  Plaintiff

argues that his representation constitutes a "statement in writing respecting the

debtor's . . . financial condition" as used in Section 523(a)(2)(B).  Debtor's

"statement" is better characterized as a promise that funds will be available in the

future, rather than a statement respecting the debtor's present financial condition.  I

find and conclude that the alleged statement does not provide the element of

nondischargeability required by Section 523(a)(2)(B).

In addition to her failure to prove that this provision in the settlement

agreement is actionable under Section 523(a)(2)(B)(ii), however, Debtor provided

me with no evidence supporting any finding that Debtor made the statement with "intent to deceive," as required by Section 523(a)(2)(B)(iv).

The evidence at trial established that when Debtor signed the settlement agreement, he thought he would have the funds available to make the lump-sum payment due on November 30, 2012. The evidence also established that Debtor had every intention of making the payment in question. Before Debtor signed the agreement, his mother had agreed to loan him the funds to make the full payment if other sources of funds were unavailable. In addition, Debtor believed he had access to a whole life insurance policy that could be used to make the payment. Debtor later learned that no such life insurance policy existed and Debtor's sister convinced their mother not to lend money to Debtor. But at the time Debtor signed the settlement agreement, Debtor thought the funds would be available to make the payment. Furthermore, the settlement agreement was written to establish the terms of payment of an obligation that had been previously incurred. It does not, therefore, constitute a statement of existing financial condition under Section 523(a)(2)(B).

I find and conclude that Plaintiff failed to prove that Debtor represented in writing or otherwise that he would have funds available to make the lump-sum payment set forth in the settlement agreement, which was long after the debt had actually been incurred. See GMAC Inc. v. Coley (In re Coley), 433 B.R. 476, 492

(Bankr. E.D. Pa. 2010).  I will enter judgment in favor of Debtor on that portion of

Count I based on the nondischargeability of the debt pursuant to Section

523(a)(2)(B).

## D. Complaint Count I - Debt Is Dischargeable Under Section 523(a)(2)(A) Because the Debt Did Not Arise from False Pretenses, Misrepresentations, or Actual Fraud

In Count I of her complaint, Plaintiff also maintains that the debt owed to

her by Debtor is nondischargeable under Section 523(a)(2)(A), which provides that

a discharge under Section 727 does not discharge the debtor from a debt "for

money, property, services, or an extension, renewal, or refinancing of credit, to the

extent obtained by -- (A) false pretenses, a false representation, or actual fraud . .

.." 11 U.S.C. § 523(a)(2)(A).  A creditor's objection to the dischargeability of a

debt he is owed by a debtor must be strictly construed against the creditor and in

favor of the debtor.  Rezykowski, 493 B.R. at 721.

I will consider Pennsylvania's common law elements of fraud to

determine whether Plaintiff met her burden of proving that the debt is

nondischargeable pursuant to Section 523(a)(2)(A).  Field v. Mans, 516 U.S. 59,

70 n.9 (1995).  A cause of action for fraud exists under Pennsylvania common law

when the plaintiff establishes: (1) A misrepresentation was made; (2) which was

uttered fraudulently; (3) with intent that the recipient be induced to act; (4) the

recipient justifiably relied upon the misrepresentation; and (5) the recipient

suffered damages as a result of that reliance.  Sevin v. Kelshaw, 611 A.2d 1232,

1236 (Pa. Super. 1992).

Plaintiff failed to establish the first element of a cause of action for fraud

because Plaintiff failed to prove that Debtor uttered any misrepresentation.  To the

contrary, Debtor advised Plaintiff of his need for a credit card and that, because he

had financial difficulties and a poor credit history, he was unable to get one.

Plaintiff then voluntarily added Debtor as an authorized user on her Visa card.

Debtor did not misrepresent facts about his past or present financial situation to

induce Plaintiff to make him an authorized user on the card.  To the contrary,

Debtor was forthcoming about his divorce and past and present financial situation.

Plaintiff clearly understood that Debtor's financial problems and poor credit

history prevented him from obtaining credit in his own name.

Despite this knowledge, Plaintiff authorized Debtor's use of her Visa

credit card.  All of the evidence establishes that Debtor disclosed his financial

difficulties and poor credit history to Plaintiff before she authorized his use of her

credit card.  Debtor made no misrepresentation to Plaintiff to induce her to make

him an authorized user on her credit card.  Plaintiff's argument that Debtor

fraudulently induced her to make him an authorized user of the card is misplaced and erroneous. See In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992).

Plaintiff also failed to prove that Debtor misrepresented the terms of his use of the card or that his use of the card was fraudulent. The oral understanding between the parties was that Debtor would use the credit card "primarily" for business purposes. Although the evidence established that Debtor used the card for purposes other than business, including purchasing both gifts for Plaintiff and supplies to make repairs to Plaintiff's home, the arrangement was not that Debtor would use the card solely for business purposes. In addition, Debtor credibly testified that he never intended to "max out" the card and that he intended to pay the balance that accumulated on the card by working overtime. He also credibly testified that it was important to him to pay off the balance and this testimony was corroborated by the fact that he continuously made at least the required monthly payments on the card, even after his relationship with Plaintiff terminated. For all of these reasons, I find and conclude that Plaintiff failed to prove either that Debtor misrepresented his use of the card or that Debtor's use of the card was fraudulent.

In addition, Debtor never misrepresented that he was making payments on the card because he was in fact making payments. Plaintiff testified that for the first three or four months after she gave Debtor the card, she asked him if he needed money to pay the account and if he was paying it. Debtor responded that

16

he was taking care of it and that it was current. Plaintiff testified that she understood Debtor's response to mean not necessarily that he had paid her accumulated balance, but that he was taking care of his balance with the reimbursement checks as they came in. Payments on the account, she understood, were, at a minimum, up to date. All of these understandings of Plaintiff were accurate. Debtor made continuous monthly payments on the account from January 2010, which was the first month a payment came due after he was made an authorized user, until September or October 2012, when Plaintiff filed the state court complaint against him.

Debtor testified that during this time, he repaid the business charges on the account as he was reimbursed by his employer and he made minimum payments on the remaining balances. Debtor continued to make payments on the card even after his relationship with Plaintiff ended. He reduced the outstanding balance on the card, which appears to have reached its peak in February 2011 when the balance was $14,698.54, to $11,840.85 in September 2012, when Plaintiff filed the state court action against him. Given this evidence, I find and conclude that Plaintiff failed to prove that Debtor made misrepresentations concerning the payments he was making on the card.

Plaintiff next maintains that Debtor fraudulently concealed the accumulated balance on the card. Plaintiff testified, however, that the parties never

17

discussed finances while they lived together and that she never questioned Debtor

about his use of, or the balance on, the credit card. Plaintiff also testified that

Debtor and her son would retrieve the mail as a convenience to her while Debtor

resided with her. As a result, Plaintiff never saw the billing statements on the

credit card Debtor was using because Debtor would retrieve them and pay them.

Plaintiff could have questioned Debtor about the credit card balance; Plaintiff also

could have asked to see the statements. She did neither. Debtor's retrieval of the

mail as a convenience to Plaintiff does not prove that Debtor was fraudulently

concealing the statements, or the balance of the debt, from Plaintiff.

Plaintiff next suggests that she proved that Debtor fraudulently concealed

the balances on the card because he changed the card's billing address after he

moved out of Plaintiff's residence. I disagree. Debtor credibly testified that he

believed that, for him to continue to pay the credit card bill online (which is how

he had always paid the bill), the address on the credit card had to match the address

on the debit card he was using to make the monthly payment. The address on

Debtor's debit card changed after he moved out of Plaintiff's residence. Debtor

therefore believed that he needed to change the address on the credit card to match

the address on his debit card so he could continue paying the bill. I find and

conclude that Debtor's change of address for the credit card so he could continue

to make monthly payments does not establish that he fraudulently concealed the statements or the balances on the card.[8]

Finally, Plaintiff argues that Debtor fraudulently misrepresented that he would have funds available to pay the lump sum due on November 30, 2012, as required by the settlement agreement. The evidence presented at trial, however, does not support Plaintiff's position. To the contrary, at the time he signed the settlement agreement, Debtor had every intention to pay the lump sum when it became due on November 30, 2012. Prior to signing the settlement agreement, Debtor had spoken to his mother, who had agreed to loan him the money to make the lump sum payment if other avenues of making the payment fell through. Debtor also thought he had access to a whole life insurance policy that would provide him with funds to make the payment. When he signed the settlement agreement, therefore, Debtor intended, and expected to be able, to pay the lump sum on November 30, 2012.

Debtor later discovered that no whole life insurance policy existed and his sister advised his mother not to loan him the money. The failure of Debtor's

---

[8] The evidence also established that FIA, the issuer of the Visa credit card, advised Plaintiff that Debtor did not exceed the authority he was given by her when he changed the address associated with the card. See Plaintiff's Exhibit A-12. In addition, Plaintiff filed an Identity Theft Complaint against Debtor along with a police report with the Pocono Township Police. The officer who assisted Plaintiff with the complaint closed the case without taking any action. Plaintiff also filed a private criminal complaint with the local Magisterial District Judge. No action was taken on the private criminal complaint and Plaintiff was told to pursue the matter civilly.

anticipated sources of payments to come to fruition does not transform Debtor's execution of the settlement agreement into a fraudulent misrepresentation. The statement at issue constitutes an expectation of or a hope for a future event, not a present misrepresentation. I therefore find and conclude that Plaintiff failed to prove that Debtor uttered any fraudulent misrepresentation when he executed the settlement agreement.

I need not examine the remaining elements of fraud pursuant to Pennsylvania law because Plaintiff's failure to prove that Debtor made a misrepresentation is dispositive of the issue. Without a misrepresentation, no justifiable reliance or damages arise. I therefore find and conclude that Plaintiff failed to prove that Debtor obtained any debt by use of false pretenses, a false representation, or actual fraud. The debt is therefore dischargeable under Section 523(a)(2)(A) and I will enter judgment in favor of Debtor on this portion of Count I of the complaint.

## E.  Complaint Count I - Debt Is Dischargeable Under Section 523(a)(6) Because the Debt Does Not Constitute a Willful and Malicious Injury

Count I of Plaintiff's complaint also claims that the debt owed to her by Debtor is nondischargeable under Section 523(a)(6), which excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the

property of another entity." 11 U.S.C. § 523(a)(6). "Willful" and "malicious" are

separate, distinct elements. "'Willful' refers to a deliberate or intentional injury,

not just a deliberate or intentional act that leads to injury." Southeastern

Pennsylvania Synod of the Evangelical Lutheran Church in America v. Gotwald

(In re Gotwald), 488 B.R. 854, 865 (Bankr. E.D. Pa. 2013). "'Malice' refers to

actions that are wrongful without just cause or excuse, even in the absence of

personal hatred, spite or ill-will." Id. at 866.   Once again, Section 523(a)(6) must

be strictly construed against Plaintiff and in favor of Debtor. Rezykowski, 493

B.R. at 721.

Plaintiff maintains that Debtor committed a willful and malicious injury

when he made excessive charges on the card, exceeded the credit limit on the card,

and made late payments on the card.  Debtor's conduct allegedly constituted the

torts of slander of credit, interference with contractual relations, and intentional

infliction of emotional distress.

First, to establish slander of credit, Plaintiff must prove that Debtor

published or communicated false statements to a third person concerning Plaintiff,

her property or her business. F.D.I.C. v. Bathgate, 27 F.3d 850, 871 (3d Cir.

1994).  No such evidence was presented.  Plaintiff's argument that Debtor

committed a willful and malicious injury because he slandered Plaintiff's credit is

therefore rejected.

Second, Plaintiff maintains that Debtor committed intentional interference with a contractual relationship when he made excessive charges on the card, exceeded the credit limit on the card and made late payments on the card. To establish intentional interference with contractual relations, Plaintiff must prove the following elements: "(1) [A]n actual or prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979).

Plaintiff failed to prove the key element that Debtor acted with any purpose or intent to harm Plaintiff when he used the credit card or when he made late payments on the credit card. To the contrary, Plaintiff voluntarily made Debtor an authorized user of the card, with full knowledge that Debtor was unable to procure a card in his own name because of his financial difficulties and poor credit history. Debtor then used the credit card as his own, using it to pay for business related travel expenses as well as to purchase various items and services for himself and for Plaintiff, including gifts and flowers for Plaintiff and items needed to make repair to Plaintiff's home.[9]   Plaintiff presented no evidence to

---

[9]      As noted above, Debtor also used the card to pay for an attorney relating to a moving vehicle violation. I regard these payments as being related to his employment because he needed a valid driver's license for his job.

establish that Debtor intended to harm, or acted with any purpose of harming,

Plaintiff when he used the credit card. The evidence proved only that Debtor made

late payments, which falls far short of establishing that he made the payments with

the intent or purpose of harming Plaintiff.

To the contrary, Debtor made continuous payments on the card, including

payments that at times exceeded the minimum payment due on the card. Debtor

made monthly payments for almost three years, from January 2010, the first month

a payment became due on the card after he was made an authorized user, until

September or October 2012, after Plaintiff filed her state court action against him.[10]

During this period, he reduced the outstanding balance on the card from a high of

$14,698.54 in February 2011 to $11,840.85 in September 2012. When Debtor's

payments were late, which does not appear from the evidence to have occurred

often, they were usually made only a few days after the payment due date. The

evidence established Debtor's continuous payment history on the card, his at least

occasional payments in excess of the minimum due, and his payments on the card

after his relationship with Plaintiff ended. Plaintiff buried her head in the sand and

neglected to ask Debtor about any of this while they were together and after they

parted ways. Her lack of interest in payments on and balances of her VISA debt in

the past led to her shared responsibility for the current VISA debt. Debtor's

---

[10]     Furthermore, Debtor continued making regular monthly payments on the card even after his
relationship with Plaintiff had ended.

occasional late payments on the card were not made with any intent or purpose of

harming Plaintiff, who could have learned about the status of Debtor's use of the

VISA card with minimal diligence early in their relationship.

In addition, Plaintiff failed to establish that Debtor's use and payment of

the card was the sole cause of the reduction of her credit limits on her Capital One

credit cards or of the denial of her loan application to PSECU. Capital One

provided the following numerous reasons for reducing Plaintiff's credit limits: (1)

Insufficient pay down of the balances on Plaintiff's Capital One credit card

accounts, neither of which had been used by Debtor; (2) no mortgage loans; (3)

balance on her revolving accounts was too high; and (4) proportion of Capital One

account balance to credit limit or high credit was too high. On the other hand,

PSECU denied Plaintiff's loan application because of excessive debts in relation to

her income, not solely because of the outstanding balance, or payment history, of

the Visa card. For all of these shortfalls, Plaintiff failed to prove that Debtor

intentionally interfered with her contractual relations.

Third, Plaintiff maintains that Debtor's use and less than full payment of

the Visa card constituted intentional infliction of emotional distress. To establish a

claim for intentional infliction of emotional distress, Plaintiff must prove that

Debtor's conduct was: (1) Extreme and outrageous; (2) intentional or reckless; and

(3) caused Plaintiff to suffer severe emotional distress. Hoy v. Angelone, 691 A.2d
476, 482 (Pa. Super. 1997).

For all of the reasons stated above, I find that Plaintiff failed to prove any
of the three elements. Debtor's use and payment of the credit card was not
extreme or outrageous in any way. To the contrary, as I stated above, Plaintiff
voluntarily authorized Debtor's use of the card, with full knowledge that Debtor
had bad credit and was unable to procure a card in his own name. Debtor then used
the credit card as his own, using it to pay for business related travel expenses and
to purchase various items and services for himself and for Plaintiff. This does not
establish extreme and outrageous conduct. Plaintiff's evidence of Debtor's late
payments was also not sufficient to establish extreme and outrageous conduct.
Again, as described at length above, Debtor made regular monthly payments on the
card, including payments that at times exceeded the minimum payment due on the
card. The same evidence applies here: Debtor's continuous payment history on
the card; his payments in excess of the minimum due; and his continued payments
on the card well after his relationship with Plaintiff ended. Neither Debtor's
occasional late payments nor his establishing a higher account balance on the card
constituted extreme or outrageous conduct. Plaintiff failed to prove that Debtor's
conduct established the first element of intentional infliction of emotional distress.

Second, for the same reasons as set forth immediately above, Plaintiff failed to prove that Debtor's actions relating to the VISA credit card constituted intentional or reckless behavior. And third, Plaintiff did not establish that she suffered severe emotional distress. I understand and believe that Plaintiff was very disappointed that a balance existed on the VISA, but I did not see it as severe emotional distress. Plaintiff failed to prove the second and third elements required to establish a cause of action for intentional infliction of emotional distress.

In conclusion, Plaintiff failed to meet her burden of proving that Debtor's conduct was "willful and malicious" as those terms are used in Section 523(a)(6), whether by slander of credit, interference with contractual relations, or intentional infliction of emotional distress. The debt is therefore dischargeable. I will enter judgment on this portion of Count I of the complaint in favor of Debtor.

# IV.  <u>CONCLUSION</u>

Based on the analysis and discussion set forth above, in particular my findings that Plaintiff failed to prove any of her allegations against Debtor, I find and conclude that the debt at issue is a pre-petition debt subject to discharge under Section 727(b), 11 U.S.C. §727(b).  I also find and conclude, on the same basis, that Plaintiff failed to prove, or in the alternative waived her claim, that Debtor should be denied a discharge under Section 727(a)(2), (4), or (5), 11 U.S.C. §727(a)(2), (4) or (5).  Finally, I find that Plaintiff failed to prove that the debt in issue should be found nondischargeable under Section 523(a)(2)(A) or (B), or (a)(6), 11 U.S.C. §523(a)(2)(A) or (B) or (a)(6).  I will therefore enter judgment against Plaintiff and in favor of Debtor on the complaint and order that the debt owed to Plaintiff by Debtor is dischargeable.  An appropriate order follows.

Date:  September 27, 2013         BY THE COURT

Richard E. Fehling
U.S. Bankruptcy Judge